# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**DIMITRI JORDAN,**

                     Plaintiff,

                                            **Case No. 06-C-1294**

        **-vs-**

**CITY OF MILWAUKEE,**
**ROCKY MARCOUX, MARTHA BROWN,**
**JOEL BRENNAN and RHONDA MANUEL,**

                     Defendants.

---

## DECISION AND ORDER

---

Dimitri Jordan ("Jordan") is a former employee of the Department of City Development ("DCD") for the City of Milwaukee. Jordan is an African-American male, D.O.B. 8/14/56. Jordan alleges a panoply of discrimination and constitutional claims related to the conditions of his employment and his ultimate termination in 2006. The defendants move for summary judgment. For the reasons that follow, this motion is granted.

### BACKGROUND

The stated mission of the DCD is to improve the quality of life in Milwaukee by guiding and promoting development that creates jobs, builds wealth and strengthens the urban environment, and at the same time respects equity, economy and ecology. This mission is established by the Mayor of the City of Milwaukee. Under the Office of the Commissioner, DCD operates and administers services and programs through six operating divisions: Administrative and Control Division; Housing Management Division; Economic

Development Division; the Planning Division; the redevelopment division; and the housing preservation division.

**Leadership**

In late 2003, John Norquist resigned as Milwaukee's mayor. Common Council President Marvin Pratt assumed duties as Acting Mayor on January 1, 2004. Pratt immediately discharged the DCD Commissioner at the time, Julie Penman. This change in leadership began a period of instability within DCD, which led to personnel logging extensive hours often at the expense of inter-office and inter-personal communication.

In April 2004, Pratt lost the mayoral election to Tom Barrett. Mayor Barrett asked Martha Brown, a long-time DCD employee, to serve as Acting Commissioner of DCD while he conducted a search for a new commissioner. Ms. Brown took over as Acting Commissioner in June 2004.

In September 2004, Mayor Barrett appointed Rocky Marcoux as the new permanent Commissioner for DCD. Marcoux officially assumed the duties of Commissioner in October 2004. Ms. Brown became Deputy Commissioner.

The Commissioner of DCD has a broad range of responsibilities, including the oversight of the operating divisions and the affiliate organizations, the Redevelopment Authority of the City of Milwaukee ("RACM") and the Neighborhood Improvement Development Corporation. Upon Commissioner Marcoux's tenure, he studied the structure and function of DCD and decided that he wanted to change the form and function of the Economic Development Division. Marcoux met with every Business Improvement District

-2-

Director and toured every Business Improvement District (BID) in an effort to understand the concerns of each commercial district.[1]

**Employment**

The City of Milwaukee DCD is an equal opportunity employer and where applicable, complies with Civil Service requirements. The RACM is an equal opportunity employer but is not considered a Civil Service employer. All of the positions in RACM are exempt from civil service requirements. Persons appointed to positions in RACM serve at-will and at the pleasure of the Executive Director/Secretary.

Several positions within DCD are considered exempt from Civil Service requirements pursuant to Wis. Stat. § 63.27 and Civil Service Board Rule number 1. Those positions classified as "exempt" are not subject to City Service rules nor any contractual obligation because of labor union representation.

Positions approved for exemption by the City Service Commission generally require a high degree of personal judgment in decision-making, the handling of confidential information, and sensitive interactions with a variety of customers. Because of their nature, exempt positions are not filled through a competitive hiring process and are filled by appointment by the department's Commissioner. Individuals appointed to exempt positions serve at the will of the Commissioner and hold no property interest in their employment.

---

[1] A BID is an organization formed by business and property owners in a designated geographic district. Members of the BID agree to assess themselves additional property taxes, and they spend that money on projects that improve the local business environment.

-3-

Jordan started his employment with the City of Milwaukee in the City Assessor's Office as an appraiser in June of 1991. In 2000, Jordan accepted an exempt appointment from Commissioner Julie Penman with the DCD as an Economic Development Specialist. Jordan served as an exempt management pay-grade employee. Jordan was not a civil servant nor was he represented by a union. He was not a member of senior leadership in the department, but rather was a staff employee, engaged to work on neighborhood development projects as overseen by either a higher-ranking manager in RACM, or within his own section of Economic Development.

When Jordan started with DCD, he was placed in the urban development section as a member of the development team with Jennifer Brown (a/k/a Basile), Rhonda Manuel, Maria Prioletta, Michael Brudd, Mike Wisniewski and Dan McCarthy who was the team leader. McCarthy resigned from DCD in 2003 and was replaced by Greg Shelco who then became Jordan's direct supervisor.

Jordan's work on economic development projects focused on small-scale (neighborhood) business development activities, such as connecting tenants with empty storefronts, preparing marketing and presentation materials (both published and electronic), conducting market research, and networking. Jordan did not serve as a project manager, but assisted program managers in maintaining Tax Incremental Districts (TIDs) and planning projects, including those projects that Jordan assumed after Jenny Basile resigned from the Department on October 1, 2004.

In October or November 2004, Jordan had a formal meeting with Commissioner Marcoux, wherein Marcoux asked Jordan to list what he was working on. Marcoux understood that Jordan worked in market-based research and revitalization of commercial districts. Commissioner Marcoux knew that Jordan was involved in the International Convention of Shopping Centers and thought that this was a worthwhile endeavor. Marcoux traveled with Jordan to the ISCS convention with the Mayor in May 2005 and thought Jordan did a good job.

According to Marcoux, Jordan was never bashful to approach Marcoux and tell him what he felt was important for Marcoux to know and what he (Jordan) was doing. Marcoux would actively listen to Jordan and would catalogue feedback in his mind. Marcoux read all of the materials and work product that Jordan forwarded to him for review. Marcoux thought Jordan's work product was satisfactory and that Jordan had good presentation skills, but that Jordan had trouble prioritizing work. Marcoux also felt that Jordan was resistant to a number of changes that Marcoux had for DCD overall.

### Main Street Milwaukee

In August 2004, while Brown served as the Acting Commissioner, there were a number of pressing issues that needed attention, including the Main Street Milwaukee Program. The Main Street Milwaukee Program was a program that had been proposed for the purpose of trying a new revitalization strategy in four neighborhood commercial districts in the City. The Main Street Milwaukee Program was founded on the four principles of the

national Main Street Center, which called for a large degree of local organizing and business owner participation in determining the future of a commercial district.

In 2003, DCD hired Nicole Robben to oversee an elaborate and lengthy series of community planning sessions to design the program. As members of the Economic Development staff in 2003, Jordan and Manuel were asked by then-Commissioner Penman to provide input on developing and shaping the approach that Main Street would be using in Milwaukee. Jordan's role in the planning process was to provide input on how the activities that he was responsible for in his job could interact with the Main Street Milwaukee program.

By August 5, 2004, the program design had been established. On that date, members of DCD's development staff, including Jordan, Manuel and others, met with several members of the mayor's staff to discuss Main Street Milwaukee. At the meeting, some individuals in attendance expressed support for the program and some criticized the planning process that led to the design of the Main Street program. One concern raised was that there had not been enough input from African-Americans and/or BIDs that serviced predominately African-American communities during the planning process. This criticism was initially raised by BID Director Damon Dorsey, who had previously circulated an e-mail to that effect. Jordan and Manuel championed Dorsey's viewpoint at the meeting

Brown spoke with Nicole Robben who informed her what Jordan said at the August 5 meeting and learned from Brennan that Dorsey's e-mail was discussed. Brown viewed the Dorsey e-mail as containing criticisms of the design of the Main Streets program based on Dorsey's theory that there were not enough African Americans involved in the formation and

-6-

design of the program. When Jordan heard that Brennan and Nicole Robben met with Brown to inform her that Jordan had reduced the August 5 meeting to a black/white issue, he became extremely fearful because both Brennan, his supervisor, and Brown, the new deputy commissioner, had the ability to impact his ability to advance his career within DCD.

Brown was upset about Dorsey's criticism, so she arranged a follow-up staff meeting for August 10, 2004. At the August 10 meeting, Brown emphasized that the Mayor had directed DCD to get this program moving, and that it was time for all staff to stop second-guessing the lengthy, involved planning process and the program design or champion the agendas of a dissatisfied individual. Brown stated that she was frustrated by Dorsey's criticism because it had turned their work into a black/white discussion. Brown thought that the meeting ended on a positive note.

The next day, August 11, 2004, Jordan wrote an email defending his right to criticize the program design and he copied several City employees on the email, including mayoral staff. Jordan wrote that the August 5 meeting was "an attempt to address the eight issues/concerns raised by Damon Dorsey & debated by Leo Ries & Judy Keller several weeks ago via email. I still think as a department we should be able to discuss these issues without fear of prejudice."

As a result of the concerns expressed by Jordan, as well as related concerns expressed by Manuel, Brown solicited more input from DCD staff in an e-mail. Jordan did not reply to this e-mail. Brown also met with staff members individually. Jordan told Brown that the reason he brought up Dorsey's email at the meeting was to play devil's advocate in light of

-7-

so much change in leadership during the past year and that it was important to improve a product by testing its assumptions. Brown accepted that explanation as valid. On August 11, Jordan sent Brown an e-mail to set the record straight indicating that he had raised two items of interest from the Dorsey e-mail because he felt they involved sensitive topics that should be discussed. He found it insulting and uncomfortable to have these topics labeled or marked by his peers and superiors in the department as reducing the discussion to a black/white issue.

After additional meetings with mayoral staff, Brown and the Council adopted the Main Street program in November 2004.

### Discrimination complaints

Following the meeting of August 5, 2004, Jordan began to experience anxiety about his future in DCD because he felt he was being cast a rabble rouser or a troublemaker. All of this caused him to see a therapist because he was not sleeping, wasn't eating, and was extremely paranoid with a lot of anxiety. Previously, Jordan experienced what he perceived as a hostile event on April 27, 2004, when the Harley Davidson project that was assigned to him in early 2004 was reassigned to Allison Rozek. Another hostile event perceived by Jordan was when Joel Brennan did not meet with him individually after Brennan became his new supervisor in mid-June 2004. Jordan also noticed that Brennan also seemed to cancel meetings with him at the last minute, but seemed not to do so with everyone else.

On August 30, 2004, Jordan filed an intake form with the City of Milwaukee Department of Employee Relations Office of Diversity and Outreach ("Office of Diversity")

-8-

indicating that he wished to discuss issues that were bothering him relating to harassment and/or discrimination within DCD. On September 2, Jordan met with members of the Office of Diversity to discuss concerns about the ethnic makeup of the team of employees working the proposed Main Street Milwaukee project.

On July 13, 2005, Jordan wrote to the Office of Diversity alleging that he had been a victim of protracted class harassment. On July 18, 2005, during a complaint intake interview with the Office of Diversity, Jordan accused Brennan and Brown of harassment on the basis of race, gender and age. Jordan alleged that he was systematically isolated by Brennan and Brown because even though he provided them with requested e-mail messages and memorandums they were unresponsive to his requests for assistance. Jordan further alleged that white females were favored because they received higher-priority assignments over African Americans.

On August 4, 2005, the Office of Diversity concluded that Brennan's and Brown's admitted failure to respond to various requests from Jordan was clearly inappropriate, but not severe enough to violate the City of Milwaukee's anti-harassment policy. The Office of Diversity recommended ways to improve communication with Brennan and Brown and recommended that Bonnie Vaughn act as mediator between Jordan and DCD management to clarify communication issues. The Office also recommended that there be greater transparency in the assignment of TIDs.

**Reorganization**

In 2005, the Economic Development team was reorganized by Commissioner Marcoux. Marcoux wanted a team assembled that could handle all of the issues regarding neighborhood development, which was to be separate from downtown real estate development. Marcoux approached Rhonda Manuel to discuss the reorganization because of her considerable program and personnel management experience. Marcoux also respected and valued traits in Manuel such as common sense, good judgment, originality, ambition and loyalty. Accordingly, Marcoux asked Manuel to assemble and head the neighborhood business and development team in May, 2005. Since Manuel already had existing standing as a senior manager, Marcoux did not give Manuel a promotion, but simply realigned her duties to spearhead the team.

Marcoux did not consider Jordan for the position because Marcoux did not believe that Jordan's skill sets were commensurate with what was needed to lead the team. Marcoux did not post the position and saw it as his prerogative to choose the person he felt was the best match for the job. Jordan noticed that Manuel was given an opportunity to present herself to Marcoux and Marcoux received an opportunity to understand who Manuel was and how she operated. Jordan felt that it was an advantage for Brown to know your skills, because Marcoux consults with Brown in filling exempt positions, which are not posted.

Neither Jordan's pay nor title changed as a result of the reorganizations. After the reorganization in September 2005, the division of work responsibilities was done under the

oversight of Manuel. Initially, after the reorganization, assignments remained the same. Manuel also gave Jordan some additional assignments.

Jordan and Marcoux had a meeting to discuss the reorganization. Jordan stated to Marcoux that he was concerned that he had not been chosen to lead that team and that he had a lot of questions. Marcoux went over the scope of the team and outlined Marcoux's vision for the team. Marcoux explained that Rhonda Manuel was the team leader based upon the fact that she had the broadest skill set. Marcoux told Jordan that his skills were of best service to the department and to himself as an active team member.

Once Manuel was appointed team leader of the Neighborhood Business and Development Team, Jordan felt that his already low level of access to Marcoux was even lower. At this point, Jordan did not feel like he had a friend in DCD, did not feel he had any support within DCD, felt the managers did not like him, they did not talk to him, they did not confide in him, and he did not have access to them. He felt he was alone because everyone else engaged in conversation, discourse and meetings that he was not a party to.

### Additional workplace complaints

In September 2004, Jordan went to the City's Department of Employee Relations to discuss his fears that his statements at the August 5, 2004 meeting had been taken out of context and that he was being unfairly judged by his supervisors. Jordan complained that he had suffered from a hostile work environment for a couple of years. Jordan felt that with the change in Commissioners he had been pigeon-holed in a position. Jordan thought that

assignments in 2004 had not been fair. Marcoux was never briefed on Jordan's 2004 discussions with DER. Manuel had no knowledge of Jordan's complaints to DER.

On July 13, 2005, Jordan filed a written complaint with the City's DER, that he had been misunderstood at the August 5, 2004 meeting and that he did not feel free to discuss racial topics. He complained that he felt hostility based upon his race and gender and that he was being isolated and ignored by his supervisors. (See Defendant's Proposed Findings of Fact, ¶ 227). Jordan also complained to DER that there was a favoritism in assignments to white females, and that there was a pecking order in high-priority assignments that favored white males, white females, African American females and African American males.

DER investigated Jordan's complaints and issued a determination letter to Marcoux on August 4, 2005. DER found that there was no evidence of harassment or discrimination. DER suggested as improvement, to work on communication and stated that the plan to restructure the reporting relationship within DCD Economic Development staff should offer Jordan and other staff additional support, increased communication, and clarification of chain of command issues. DER concluded that the investigation revealed no evidence of disparate treatment, discriminatory practices, or the "pecking order" as characterized by Jordan.

During DER's investigation, DCD shared its plan with DER to re-organize the staff of which Jordan was a part so that DCD would create a new neighborhood and business development team that would be configured in a manner that would provide better opportunity and more interaction with Jordan's supervisor. Previous to Jordan's complaint, Marcoux and Brown had begun working with Rhonda Manuel to re-organize the staff into

-12-

a new neighborhood business and development team that would be headed by Manuel. The process of reorganization had begun in May 2005, because the departure of several staff left certain employees with no middle management. The Economic Development staff, including Jordan, had been reporting to Joel Brennan. Brennan had too many things on his plate to provide these employees with the supervisory feedback that they needed, so the Commissioner asked Brown and Manuel to brainstorm on how to reconfigure the section under Manuel's leadership in order to reestablish middle management that had been lacking since 2004.

Commissioner Marcoux believed that forming the neighborhood business and development team would eliminate the examples of an implied lack of communication. After DER's conclusion of the investigation, in August 2005, Commissioner Marcoux spoke with Personnel Office Bonnie Vaughn about helping to facilitate better lines of communication with Jordan given DER's recommendation. Marcoux asked Vaughn to help the transition of the reorganization of the Economic Development Team by being the point person if Jordan had any personal concerns during or after the reorganization.

On August 10, 2005, Commissioner Marcoux wrote to the Director of DER and advised that Vaughn would be the point person for any further personnel issues that Jordan might have. Jordan was copied on the letter and made aware that he had access to Vaughn if he felt left out. After the reorganization in September 2005, Jordan did not ask Vaughn for any clarification or help on personnel issues through April 3, 2006.

-13-

On November 17, 2005, Jordan sent an e-mail to Manuel requesting the opportunity to discuss how she assigned neighborhood project management and real estate development projects. He reminder her that he had experienced a number of neighborhood development initiatives and could share his insight. Manuel responded that she had assigned the project to Dwayne Edwards.

On or about November 18, 2005, Jordan returned to DER to complain about the same facts he complained about in July 2005. Jordan also complained that he had been demoted, stripped of certain responsibilities and duties, and that Manuel was promoted ahead of him even though she had less seniority and experience. On December 5, 2005, DER met with Jordan and told him that there was not enough information to re-open the investigation that had been concluded on August 4, 2005. Jordan was advised that he could make another complaint but Jordan did not follow-up with DER and never submitted anything in writing.

**Sick leave and EEOC complaint**

Beginning in July 2005, Jordan was periodically absent on sick leave for five months – 7/12/05 to 7/13/05, 7/19/05 through 8/15/05, 9/26/05 through 9/29/05, 11/9/05 through 11/11/05, 12/2/05, 12/9/05 until 4/3/06, and finally from 4/28/06 to 5/15/06. Jordan also took vacation time separate from this sick leave time during the fall of 2005.

DCD's personnel officer followed up with Jordan for the necessary documentation to support his application for sick leave. All of Jordan's sick leave time taken in 2005 and 2006 was approved with DCD. Jordan returned from his sick leave with no cut in pay.

On March 22, 2006, while Jordan was on his extended sick leave, he filed a Charge of Discrimination alleging that he suffered discrimination based upon race, sex, age and retaliation. Jordan complained about retaliation dating back to the August 2004 meeting, wherein he was accused of turning a meeting into a black/white issue. He also complained about Manuel's promotion at his expense, a subsequent loss of job responsibilities, and the loss of a budget and access to interns. On October 3, 2006, the EEOC dismissed the charge on a finding that it was unable to establish a violation of the relevant statutes.

On or about April 3, 2006, Jordan attended a meeting with Manuel and Vaughn to discuss his work assignments given the reorganization and his return from sick leave. After that meeting, Jordan stated that he had additional concern about the status of his assignments.

On April 6, 2006, Vaughn advised Jordan that they could meet the following week to address his concerns. On April 10, 2006, Jordan responded to Vaughn that based upon his pending EEOC charge that he would not be amenable to a meeting unless he was given a written response to his questions. On April 12, 2006, Vaughn responded that in lieu of a written response, she would schedule a meeting as a productive way to get answers to his questions. Vaughn told Jordan that she invited Deputy Commissioner Brown and Manuel to the meeting, and that it would be fine if Jordan wanted someone from DER to be in attendance as well. On April 13, 2006, Jordan responded to Vaughn's April 10, 2006 email by stating that it would not be productive to meet without his attorney given the quasi-litigious state of his EEOC investigation.

-15-

On or about April 25, 2006, Vaughn spoke with Jordan and told him that Allison Rozek had assumed Mike Wisnewski's position in January 2006, and that Jordan's work on projects under the direction of Wisnewski would now be under the direction of Rozek. Vaughn told Jordan that given the reorganization, there was probably going to be a natural separation of work done by RACM project managers and Neighborhood Development staff. Jordan complained that others who returned from sick leave were allowed to resume their prior assignments. Vaughn told Jordan that he could ask Brown and Manuel any other questions he might have at a meeting she had tentatively scheduled for April 28, 2006. Vaughn advised Jordan that she had also invited a representative from DER to the meeting.

Jordan told Vaughn that he wanted her to advise him in writing regarding the purpose of the meeting and why he could not bring legal counsel. On April 25, 2006, per Jordan's request, Vaughn sent him an email advising that the meeting was at his request to answer questions pertaining to his work assignments and any concerns he may have. Vaughn's email stated that legal counsel would not be appropriate and if he did not have concerns about his current work assignments, a meeting would be unnecessary.

On April 26, Jordan responded to Vaughn's email and told her that he had concerns about his demotion and current work assignments. Jordan suggested that his attorney and the City Attorney meet to discuss his concerns. On April 27, Vaughn sent Jordan a meeting notice for April 28 to discuss work assignment issues. Jordan declined the meeting due to a personal commitment with a family member, stating that he was not to discuss the matter without his counsel present.

-16-

On October 3, 2006, the EEOC sent Jordan a Right to Sue letter in relation to his March 2006 complaint. The notice was copied to DCD, and the DCD's notice was placed in Jordan's mail slot at work. Jordan viewed the placing of the letter in his mail slot as an intentional act of intimidation.

### Incident leading to termination

On October 10, 2006, at approximately 9:00 a.m., Manuel reported that she had an encounter with Jordan wherein she felt physically threatened. This encounter occurred after Jordan approached Manuel about the decision that two people other than Jordan would attend an out-of-state symposium.

Jordan asked Manuel if he was to attend the seminar, and Manuel said no. Jordan approached her for a second time. Manuel told Jordan that she did not have time to discuss it because she was working on a budget proposal and, in any event, had made her decision. Manuel's demeanor towards Jordan was terse.

Jordan became irritated. He swore at Manuel, yelled the "f" word at her several times, and challenged her managerial abilities. Manuel told him he was close to insubordination. Manuel tried to walk away, but Jordan followed her mumbling. Jordan then walked to his desk and made another comment about Manuel. Jordan then approached Manuel again and said to Manuel that she had not answered his fucking question, and pointed his finger at her. Manuel felt physically threatened. Jordan invaded her space and scared her. She felt that he backed her into her cubicle. Jordan got so close to her that she could smell his cologne and his breath. Manuel testified that Jordan had a crazy zoned-out look on his face and that she

-17-

thought he was going to hit her.  Manuel testified that, as a result, she moved out of the area very quickly.  She was scared.

Manuel immediately asked a secretary to call security.  Manuel was distraught, scared and shaking.  She immediately advised Brown of what happened.  Manuel also called a family friend that worked in the police department.  Brown spoke with Todd Slussar, a personnel employee, who confirmed to Brown that Jordan was out the rest of the day on appointments and that Manuel seemed scared and upset.

At this point, Jordan felt it was extremely transparent that within one week after receiving his right to sue letter from the EEOC that the powers and opportunities to learn and advance himself professionally within DCD were stripped.  Later that morning, Jordan sent an e-mail to Brown and Manuel requesting a meeting, because he felt he was unable to engage in discussions or ask pertinent questions as they related to his job without the threat of being written up retaliated against in other ways.

That morning, Brown also spoke with Marcoux.  Marcoux told Brown to investigate Manuel's allegation and to get Jordan's side of the story.  Brown decided to place Jordan on administrative leave with pay so that she could concentrate on investigating the allegation.  Brown had never investigated an allegation of workplace violence of professional management staff before.  Jordan was  advised that a due-process hearing was scheduled on October 13, 2006.

Slussar conducted the due process hearing on October 13, with Brown in attendance.  Jordan brought a representative to the meeting, Rev. Bobby Sinclair.  Jordan stated that he

was frustrated by Manuel because she had been unresponsive to him about his attendance at the out-of-state seminar. Jordan admitted to raising his voice and using profanity. After the due process hearing, Brown spoke with Manuel, who stated that she was extremely frightened and did not think that she could supervise Jordan any longer.

After the investigation concluded, Brown met with Marcoux and briefed him on what the various witnesses and Jordan said at the due process hearing. Brown advised that based upon the threatening and aggressive nature of Jordan's behavior and Manuel's fear, the supervisor/subordinate relationship was very badly damaged, possibly beyond repair. Marcoux spoke with Manuel after being briefed. Marcoux believed Manuel's account of fear and intimidation to be reasonable under the circumstances, but not Jordan's explanation that he was provoked. Marcoux believed that Jordan's actions rose to the level of insubordination and were disruptive to the professional work environment.

On October 16, 2006, Marcoux terminated Jordan's exempt appointment based upon "insolence and violation of the Department's Workplace Violence Policy. Specifically, that the investigation revealed that on October 10, 2006, Mr. Jordan engaged in verbal abuse, bullying and intimidating acts, and engaged in aggressive and hostile behavior that created a reasonable fear of injury to another person (his Supervisor) and subjected another person (his Supervisor) to emotional distress."

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

-19-

is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## I.    Discrimination[2]

Jordan concedes that he has no direct or circumstantial evidence of race, gender, or age discrimination. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 n.3 (7th Cir. 2005) (party can proceed under the direct method using direct or circumstantial evidence); *see also Lewis v. School Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008) (direct evidence is evidence which, if believed by the trier of fact, "will prove the fact in question without reliance upon inference or presumption;" circumstantial evidence "allows the trier of fact to *infer* intentional discrimination by the decisionmaker," typically through a longer chain of inferences) (emphasis in original). Therefore, Jordan proceeds under the indirect, burden-shifting framework.

To establish a *prima facie* case of discrimination under the indirect method, Jordan must meet the following elements: (1) he belongs to a protected class; (2) he performed his

---

[2] Jordan brings claims under Title VII, the Age Discrimination in Employment Act ("ADEA"), the equal protection clause by virtue of 42 U.S.C. § 1983, and 42 U.S.C. § 1981. The basic elements of these claims are identical and need not be discussed separately. *See, e.g., Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) (same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) ("we generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981").

job according to the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the defendants. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Jordan's prima facie case falters in many respects. Where it does not falter, Jordan fails to establish that the defendants' justifications were pretextual.

## A.    Adverse employment actions

An adverse employment action must involve more than a mere inconvenience or an alteration of job responsibilities to be actionable under Title VII. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). There are three general categories of actionable, materially adverse employment actions: (1) changes to the employee's current wealth such as compensation, fringe benefits, and financial terms of employment including termination; (2) changes to the employee's career prospects thus impacting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting him to humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alterations in his workplace environment. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002).

Many of Jordan's workplace-related complaints simply do not meet the standard for an adverse employment action. For example, Jordan complains about being denied an intern and being denied the opportunity to attend training seminars. The record is undisputed, however, that Jordan was allowed to attend numerous training seminars, so the denial of the request to attend one seminar cannot be considered materially adverse. While the denial of

-21-

an intern could have made Jordan's job more difficult, there is nothing in the record suggesting that the lack of an intern made Jordan's job so difficult that it resulted in a significant, negative alteration of his workplace environment. "Not everything that makes an employee unhappy is an actionable adverse action." *Nichols*, 510 F.3d at 780.

The same logic applies to Jordan's repeated complaints that he "felt isolated" or that he did not have enough access to Marcoux and Brown. Jordan argues that because promotional opportunities were not normally posted at DCD, access to Marcoux and Brown was essential so they could "know your skills." Jordan's subjective feeling of isolation does not raise his speculation as to promotion or career advancement to the level of an adverse employment action. *See, e.g., O'Neal v. City of Chicago*, 392 F.3d 909, 912-13 (7th Cir. 2004) (mere speculation as to how an employee would benefit from a lateral transfer is insufficient evidence to support an adverse employment action); *Aquilino v. University of Kansas*, 268 F.3d 930, 936 (10th Cir. 2001) ("Speculative harm does not constitute adverse employment action").

### B. Similarly situated

Obviously, the parties do not dispute that Jordan's termination qualifies as an adverse employment action. However, Jordan still cannot satisfy his *prima facie* burden because he fails to provide evidence of similarly situated individuals. Jordan fails to identify anyone outside of his protected class who was involved in a violent workplace altercation but was not eventually terminated.

-22-

Jordan also argues that it was "common practice" that persons returning from extended sick leave would re-assume all of their projects and work assignments. However, he provides no evidence identifying these individuals. Therefore, even if the loss of such assignments could be considered materially adverse, the Court cannot evaluate whether these individuals are similarly situated as a matter of law. *See, e.g., Crawford v. Ind. Harbor Belt. RR. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (a similarly situated employee is one who is "comparable to the plaintiff in all material respects").

### C. Failure to promote

The promotion of Manuel over Jordan as head of the Neighborhood Development team likely qualifies as an adverse employment action, even though the City chooses not to characterize it as a promotion. Jordan also claims to have lost out on a promotion when Allison Rozek was promoted to senior economic specialist because of her enhanced "opportunities" to work with Marcoux and Brown. In the context of a failure to promote, the plaintiff must show that the person who was promoted had the same or lesser qualifications. *See Ghosh v. Indiana Dep't of Envtl. Management*, 192 F.3d 1087, 1091 (7th Cir. 1999). Jordan completely fails to establish that he was as qualified as Manuel or Rozek for either of these positions. In fact, the undisputed evidence suggests that Manuel and Rozek were more qualified than Jordan. *See, e.g.,* DPFF, ¶¶ 435-440 (explaining that Rozek was considered best candidate because of her knowledge of the Park East redevelopment plan); DPFF, ¶¶ 190-193 (explaining that Manuel was promoted to team leader because she was more qualified than Jordan for the position).

-23-

### D. Pretext

If the plaintiff establishes a *prima facie* case, then "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). If the employer meets this burden, the plaintiff must show by a preponderance of the evidence that the employer's stated reason for its employment decision is a pretext for discrimination. "Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). "Showing pretext requires '[p]roof that the defendant's explanation is unworthy of credence.'" *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1063 (7th Cir. 2008).

Even if Jordan established a *prima facie* case, his claims would fail because he does not establish pretext. Defendants proffer legitimate, non-discriminatory justifications for all of their employment actions with respect to Jordan. Jordan completely fails to address the issue of pretext, so there is no genuine issue of material fact.

## II. Retaliation

Title VII prohibits employers from punishing employees for complaining about discrimination or other practices that violate Title VII. *See* 42 U.S.C. § 2000e-3(a). The direct method requires the plaintiff to show (1) statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two. *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

-24-

A plaintiff can prevail under the direct method by constructing a "'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). The most common type of circumstantial evidence "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007) (quoting *Troupe*, 20 F.3d at 736).

It is undisputed that Jordan lodged a variety of complaints, both with the City of Milwaukee and the EEOC, which qualify as protected activities under Title VII. To establish causation, Jordan relies primarily on ambiguous statements and suspicious timing. Jordan argues that Marcoux's statement in September 2005 that Jordan could embrace his decision to make Manuel the team leader or find something else to do, which occurred shortly after Marcoux wrote to the director DER regarding one of Jordan's complaints in August 2005, is circumstantial evidence of intentional discrimination. Marcoux's statement is hardly ambiguous, as it was made in the context of explaining a promotion decision, and it betrays no relation to any of Jordan's protected activities. Circumstantial evidence "'must point directly to a discriminatory reason for the employer's action.'" *Rhodes*, 359 F.3d at 504 (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

Jordan also argues he was stripped of many of his worthwhile projects upon his return from sick leave on April 3, 2006 in retaliation for his EEOC complaint filed just 12 days earlier on March 22, 2006. Aside from temporal proximity, Jordan offers nothing which reasonably suggests that he was stripped of work projects because of his EEOC complaint. The evidence more reasonably suggests that Jordan lost work because of the extreme length of his absences.

Finally, Jordan argues that Manuel's refusal to allow him to attend an out-of-town training seminar on October 10, 2006 is causally connected to his protected activities because DCD received a copy of his right to sue letter just six days earlier. However, the decision that Jordan would not attend the seminar was made long before the right to sue letter was received at DCD. *See* DPFF, ¶¶ 306-308. Outside of this coincidence, there is nothing suggesting that the refusal to allow Jordan attend this training seminar was in any way related to his protected activities.[3]

The alternative indirect method requires the plaintiff to show the following: (1) he engaged in statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903-04 (7th Cir. 2005). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to present evidence of a non-

---

[3] As discussed above, this claim does not meet the standard for a materially adverse employment action, even in the context of retaliation. *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005) ("nothing in § 2000e-3(a) says or even hints that the significance or materiality requirement has been dispensed with"). Further, Jordan fails to demonstrate defendant's withdrawal of work assignments after his lengthy sick leave was pretextual.

discriminatory reason for its employment action. *Id.* If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual.

For many of the same reasons previously stated, Jordan cannot establish a *prima facie* case because the vast majority of the employment actions he complains of were not materially adverse. Alternatively, he provides no similarly situated individuals for comparison with respect to the employment actions that could be considered materially adverse. Finally, even if Jordan could meet his *prima facie* burden, he fails to address pretext – for example, Jordan provides no evidence that Manuel was promoted ahead of him because of Jordan's protected activities, as opposed to Marcoux's opinion that Manuel was more qualified for the team leader position.

## III. First Amendment

Jordan alleges that his First Amendment rights were violated when he was subject to retaliation for speaking-out on diversity and central city issues concerning the Main Street Milwaukee project. A public employee "does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). Before asking whether the subject-matter of a particular speech is a topic of public concern, the Court must decide whether the plaintiff was speaking "as a citizen" or as part of her public job. *Mills v. City of Evansville, Indiana*, 452 F.3d 646, 647 (7th Cir. 2006). "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti v. Ceballos*, 547 U.S. ___, 126 S. Ct. 1951, 1960 (2006).

Jordan argues that he was not speaking as an employee because it was not part of his job duties to speak out on sensitive racial issues. This distinction is unavailing because "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti* at 1960 (emphasis added). While it wasn't in Jordan's job description to explore racially sensitive issues, his speech took place in connection with the performance of his official duties for the DCD. *See, e.g., Mills* at 648 ("Mills was on duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged from . . . briefing [and] . . . [s]he spoke in her capacity as a public employee contributing to the formation and execution of official policy"). This undisputed fact makes Jordan's speech unprotected for purposes of the First Amendment.

## IV.    Miscellaneous

The foregoing discussion demonstrates that none of Jordan's claims can survive summary judgment. In the alternative, Jordan's § 1983 and § 1981 claims against the City of Milwaukee (and the individual defendants in their official capacity) are without merit because the alleged constitutional deprivations were not the result of an official policy or custom. *See Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690-91 (1978)); *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) ("official capacity claim against an individual defendant constitutes a claim against the government entity itself").

-28-

As for the § 1983 and § 1981 claims against the defendants in their individual capacity, these claims are barred by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (government officials performing discretionary functions are shielded from liability insofar as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.    Defendants' motion for summary judgment [D. 29] is **GRANTED**; and

2.    This matter is **DISMISSED** with prejudice.

Dated at Milwaukee, Wisconsin, this 19th day of August, 2008.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**

-29-